UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-CR-00839-HEA |
| | ) | |
| MARY ANN GIBSON, | ) | |
| | ) | |
| Defendant. | ) | |

### SENTENCING MEMORANDUM OF
### DEFENDANT MARY ANN GIBSON

On October 10, 2019, Defendant, Mary Ann Gibson, pled guilty to one count of bank fraud, in violation of 18 U.S.C. § 1344.  The charge stemmed from misrepresentations made by Ms. Gibson to Enterprise Bank to induce the bank to continue to advance funds under a line of credit to Ms. Gibson's business, Mozaic Group ("Mozaic"), so that Mozaic could continue to operate long enough for the business to be sold and, Ms. Gibson hoped, generate sufficient proceeds to repay the bank.   The Probation Office has calculated Ms. Gibson's advisory sentencing guideline range to be imprisonment for 33 to 41 months, based upon a total offense level of 20 and a criminal history category of I.  Presentence Investigation Report ("PSR") at ¶ 69.  The Probation Office has also identified factors that would support a downward variance, including Ms. Gibson's age (63) and lack of criminal history, and the fact that Ms. Gibson "did not appear to receive a significant gain from the scheme other than to keep her company viable and continue to receive a salary."  PSR at ¶ 87.

The District Court in *United States v. Eggleston*, 347 F.Supp.3d 381 (E.D.Wis. 2018), faced a sentencing decision in a case presenting facts remarkably similar to those of the case at bar.  In *Eggleston*, the defendant pled guilty to bank fraud after directing "employees at his

trucking company to submit fraudulent invoices in order to obtain cash advances on a line of credit." *Eggleston*, 347 F.Supp.3d at 382.  Mr. Eggleston was "67 years old with no prior criminal record and an otherwise positive background." *Id.* at 384.  As in the present case, the sentencing guidelines recommended imprisonment for 33 to 41 months, based on offense level 20 and criminal history category I.  *Id.* at 382-83.

The Court found as a mitigating factor that Mr. Eggleston "acted to try to keep his business afloat, not out of greed, to personally enrich himself, or to fund a lavish lifestyle." *Id.* at 384.  The Court further found "no need to protect the public from defendant, given his age, lack of any prior record, and otherwise positive background." *Id.*  The Court also believed that its sentence would facilitate payment of restitution. *Id.* at 385.  The Court sentenced Mr. Eggleston to one day/time served, plus three years supervised release, with a condition of six months home confinement. *Id.* at 385.  Ms. Gibson respectfully believes a similar sentence to be appropriate in this case, and she respectfully asks the Court to consider imposing such a sentence.

If the Court believes that it must impose a longer sentence of imprisonment, Ms. Gibson respectfully suggests a sentence within the range of no more than 18 months.  This range derives from a sentencing guideline for economic crimes proposed by a task force of the Criminal Justice Section of the American Bar Association (the "ABA Task Force"), discussed in greater detail below.  *See infra.* at pp. 9-10.  The task force's proposed guideline, consisting of judges, professors, attorneys and an official from the Department of Justice,[1] developed because some or

---

[1] The Department of Justice official participated as an "observer," as did a representative from the Federal Defender.  *See* A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes, Final Draft, Nov. 10, 2014 ("ABA Proposal"), attached hereto as Exhibit A, at p. 8.

most of the task force's members believed that the current sentencing guideline for economic crimes greatly overemphasizes the loss amount in determining the offense level.

<u>**Factors Supporting a Downward Variance**</u>

The Court should vary downward from the advisory guideline range because a sentence within that range would exceed what is necessary to carry out the objectives of sentencing as established by Congress.  "The court shall impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes" of sentencing set forth in the pertinent statute.  18 U.S.C. § 3553(a) (emphasis added).[2]  Ms. Gibson respectfully suggests that the factors discussed below support the conclusion that the advisory guideline range is simply too long in light of the facts and circumstances of this case.

1. **Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1)[3]**

As stated above, Ms. Gibson committed the instant offense "not out of greed, [or] to personally enrich [her]self, or to fund a lavish lifestyle."  *Eggleston*, 347 F.Supp.3d at 384.  Rather, Ms. Gibson committed the instant offense in order to keep Mozaic operating until such time as the business could be sold and, Ms. Gibson hoped, Enterprise Bank could be repaid.

Ms. Gibson's hopes were not unrealistic, although they were ultimately not realized.  In January 2017 Ms. Gibson entered into a contract to sell the company for approximately $6 million, an amount that would not generate any money for her personally but would pay the line

---

[2] The statutorily-enumerated purposes of sentencing are:  "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

[3] Ms. Gibson submits herewith as Exhibit B a personal statement, written by her and in her own words, with very little editing by counsel.  In her statement Ms. Gibson describes in detail her offense.  This Memorandum assumes familiarity with that statement.

of credit and other creditors and allow most of Mozaic's employees to keep their jobs.  That sale was set to close in October 2017 but failed to close due to actions of a minority owner of the company.  Ms. Gibson later found other possible buyers of the company, but those deals did not move forward for various reasons.  In February 2018 three of Mozaic's employees offered to buy the company for $1.5 million, which would be financed by Enterprise Bank, but the same minority owner who had scuttled the $6 million deal now refused to execute certain documents required by the bank in order for the $1.5 million transaction to occur.  Ms. Gibson respectfully asks the Court to consider, when imposing sentence, that during and after the commission of her offense, Ms. Gibson tried to do what she could to rectify the situation by selling the business so that the bank could be repaid.

Of course, Ms. Gibson knows that if the business lacked the capital to continue she should have allowed the business to fail rather than submit false information to the bank in order to keep the business going.  She knows she was wrong and that she committed a crime.  But, she submits, her crime differs significantly from that committed by someone who embezzles from an employer and puts the funds in his own pocket, or who lures investors to contribute their money to a phony enterprise and who instead spends the money on herself.  As discussed in more detail below, the advisory sentencing guidelines treat Ms. Gibson's offense as more similar to the latter two scenarios than is warranted.  This Court, therefore, should grant a downward variance.

Ms. Gibson's personal qualities also support her request for a downward variance.  The letters submitted to the Court on Ms. Gibson's behalf, *see* Doc. 31, attest to her many good deeds and her overall good character. The letter writers – family members, friends and business associates of Ms. Gibson – use many positive adjectives to describe her:  kind, caring, generous, giving, loving, compassionate, warmhearted.    Ms. Gibson's brother told the probation officer

4

that she is "hard working" and "cared a lot for her employees."  PSR at ¶ 42.  Her husband

described her "as a good person who cares a lot about her family and employees."  *Id.* at ¶ 44.

Ms. Gibson even gets along well with her first husband; the couple had a good marriage but

divorced because of different desires with respect to having children.  *Id.* at ¶ 43.

      The letters tell story after story of Ms. Gibson going above and beyond to attend to the

needs of others.  She provided assistance to elderly relatives, to cousins, to nieces and nephews,

and to the children of her second husband, becoming a mother-figure and guide to those children.

She provided assistance to friends.  She provided assistance to her employees.  She helped her

cousin deal with the death of his 42-year-old wife.  She helped her sister-in-law cope with the

handicap, and subsequent death, of a daughter.  She helped an employee deal with alcoholism.

      The letters also point out what Ms. Gibson is *not*.  She is not prideful or haughty.

"[O]ver 30 years, I have never seen Mary Ann flaunt her successes."  Doc. 31 at p. 9.  Her

current employer notes the many tasks she performs including clerical assignments such as

"scheduling meetings, ordering supplies or typing documents."  Doc. 31 at p. 18.  He then

observes, "From the moment I brought her on board, she has constantly reminded me of her

willingness to do any task required, no matter how mundane.  I don't think she has an arrogant

bone in her body."  *Id.*

      The letters also reveal that Ms. Gibson is trustworthy, despite the offense which she

committed.  Her sister-in-law comments that "even though I have four sisters and three brothers,

I trusted Mary Ann with my medical power of attorney before I was married."  Doc. 31 at p. 4.

      Perhaps most noteworthy of all, two letter writers, with full knowledge of Ms. Gibson's

current legal situation, expressed interest in continuing to do business with or employ her.  Says

one former business associate:  "I jumped at the chance to work with her again.  And I will jump

at the chance to work with her again in the future.  I think the world of her and trust her completely."  Doc. 31 at p. 17.  And her current employer writes, "I would have no hesitation appointing her to any fiduciary role I can think of . . . [S]he is playing a critical role in our firm and my hope is that she can continue for the foreseeable future."  Doc. 31 at p. 18.

In short, Ms. Gibson's history and characteristics make her worthy of favorable consideration by the Court.

## 2.  The Purposes of Sentencing (18 U.S.C. § 3553(a)(2)), including need for medical treatment (18 U.S.C. § 3553(a)(2)(d))

Ms. Gibson respectfully contends that any sentence the Court imposes upon her in this case will reflect the seriousness of her offense, promote respect for the law, provide just punishment, and afford adequate deterrence.  *See* 18 U.S.C. § 3553(a)(2)(A) and (B).  Whatever the sentence, Ms. Gibson will forever be branded a convicted felon.  She has suffered, and will continue to suffer, a great loss to her reputation among those who know her, although many of those people continue to support her.  The loss of Mozaic has caused financial ruin to her and to her family members.  She will lose her Florida real estate license.  Following her guilty plea, Bank of America closed her account and refused to have anything to do with her.  Even a sentence along the lines of that handed down in *Eggleston* (one day time served followed by supervised release) would constitute substantial punishment, as supervised release entails a significant infringement on liberty.  *See Gall v. United States*, 552 U.S. 38, 44 (2007) ("[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty…[p]robation is not granted out of a spirit of leniency…probation is not merely letting an offender off easily).

Certainly this Court should have no difficulty concluding that a sentence of incarceration for Ms. Gibson is not needed "to protect the public from further crimes of the defendant."  18

U.S.C. §33553(a)(2)(C).  *See also Eggleston,* 347.F.Supp.3d at 384 (taking into account the defendant's "age, lack of any prior record, and otherwise positive background").

Ms. Gibson's medical issues weigh against a sentence of incarceration.  *See generally* PSR at ¶ 47.  She has a heart condition.  She has sleep apnea.  She uses a CPAP machine to keep her airway open during sleep.  It is the undersigned's understanding that she might not be permitted to bring her CPAP machine with her if she is remanded to the Bureau of Prisons.[4]

### 3.  The Advisory Guideline Range (18 U.S.C. § 3553(a)(4) and (5))

The Court may be familiar with the extensive criticism which the sentencing guidelines have received over the years with respect to their approach to sentencing for economic crimes. "[T]he economic crime guidelines have been criticized in recent judicial decisions as 'patently absurd on their face,' 'a black stain on common sense,' and, ultimately, 'of no help.'" Testimony of James E. Felman on behalf of the American Bar Association before the United States Sentencing Commission, Mar. 12, 2015 (available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150312/Felman.pdf) ("Felman Test.") at p. 1.  *See also* David Debold & Matthew Benjamin, "*Losing Groud" – In Search of A Remedy for the Overemphasis on Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and Theft,*" 160 U.Pa.L.Rev. PENNumbra 141 (2011).

As originally promulgated, the sentencing guidelines for economic crimes provided for harsher sentences (primarily in the form of custodial rather than probationary sentences) as compared to sentences handed down by courts for such crimes prior to the guidelines.  *See*

---

[4] It is the understanding of the undersigned that the Bureau of Prisons might provide her with a CPAP that it approves.  The undersigned does not know how much delay, if any, there would be between Ms. Gibson's arrival at the institution and the approval and delivery of a CPAP.  Such a delay could pose significant health risks for Ms. Gibson.

Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 20 (1998).  Notably, the initial guidelines intended to provide a "*short but definite* period of confinement" for white collar offenders.  United States Sentencing Commission, *Fifteen Years of Guideline Sentencing*, at 56 (Nov. 2004) (quoting *Sentencing Commission Guidelines*, Hearing Before the Senate Comm. on the Judiciary, 100th Cong., 1st Sess., at 55 (1987) (statement of Commissioner Breyer)) (emphasis added).

Over the years, however, the concept of *short but definite* periods of confinement, as originally intended, appears to have been forgotten as the Commission repeatedly increased the severity of sentences for economic crimes.  *See* Felman Test. at p. 1 (characterizing the Commission's actions as "relentless upward ratcheting").

The present case illustrates this effect.  As noted above, the advisory guideline range for Ms. Gibson's offense is 33 to 41 months imprisonment.  Were Ms. Gibson being sentenced under the guidelines as originally enacted, her sentencing range would be from 15 to 21 months.[5]

Commentators have agreed that the increased severity of the sentencing guidelines for economic crimes lacks empirical justification; that is, there is no evidence that increasing the sentences achieves any of the objectives of a sentencing system.  *See*, *e.g.*, Felman Test. at p. 3 (when Sentencing Commission initially increased guidelines penalties for economic crimes, Commission cited "no data demonstrating that these initial increased penalty levels were inadequate"); Debold & Benjamin, *supra,* at p. 143 (criticizing "the inconsistency and irrationality underlying the Commission's insistent upward ratcheting").

---

[5] 1987 Guidelines Manual:  Section 2F1.1, Base Offense Level of 6, plus 10 levels for loss between $2 million and $5 million, minus 2 levels for acceptance of responsibility pursuant to Section 3E1.1, yields a Total Offense Level of 14.  At Criminal History Category I, the guideline range for level 14 was 15 to 21 months.

Commentators also agree that the most glaring flaw with the current economic crime guideline revolves around its emphasis on loss.  "The Guidelines place undue weight on the amount of loss involved in the fraud.  This is certainly a relevant sentencing factor . . . . But the guidelines provisions for theft and fraud place excessive weight on this single factor . . . . In many cases . . . the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence."  *United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004); *Eggleston*, 347 F.Supp.3d at 384 ("the guidelines treat a person who steals $100,000 to finance a lavish lifestyle the same as someone who steals the same amount to pay for an operation for a sick child") (internal quotation marks and citation omitted).  *See also* Felman Test. at p. 9 ("[i]n the initial 1987 guidelines, the amount of the loss could result in no more than a five-fold increase in the range of imprisonment.  Under the [2014] guidelines the loss can increase the range nearly forty-fold.  The reliance on loss to drive sentencing outcomes is simply out of control").

Accordingly, the ABA Task Force, in 2014, proposed a major revision to the economic crimes guideline, one that considered loss but placed less weight on loss relative to other factors.  *See* ABA Report, Exhibit A, at pp. i – 7.  The ABA Task Force's proposal suggests, for economic crimes, a Base Offense Level of between 6 and 8.[6]  The proposal then adds or

---

[6] Were it to adopt the ABA Task Force's proposal, the United States Sentencing Commission would determine whether the base offense level would be 6, 7 or 8.

subtracts from the Base Offense Level by applying the Specific Offense Characteristics of loss, "culpability,"[7] and victim impact.[8]

The spreadsheet attached hereto as Exhibit C shows the application of the ABA Task Force's proposal to the instant case.  The exhibit assumes that under the proposal Ms. Gibson could have either "low" or "moderate" culpability.  Because the proposal suggests that the Base Offense Level could be 6, 7 or 8, there are two possible total offense levels (12 or 13)[9] for moderate culpability, corresponding to a guideline range of 10 to 16 months or 12 to 18 months.  But if Ms. Gibson's culpability category under the proposal would be "low," then her Total Offense Level could be anywhere from 7 to 11, since the culpability reduction could be 3, 4 or 5 levels, depending upon the number chosen by the Commission were it to adopt the ABA Task Force's proposal.  Under these circumstances, Ms. Gibson's sentencing guideline range could be 0-6, 4-10, 6-12 or 8-14.

---

[7] With respect to "culpability," the proposal establishes five levels, pursuant to which the Base Offense Level could be reduced (if the defendant had "low culpability" or "lowest culpability"), increased (if the defendant had "high culpability" or "highest culpability") or not changed (if the defendant had "moderate culpability").  To determine the culpability level, the Court would look at such factors as motive/nature of the offense, gain to the defendant, degree of sophistication/organization, duration, extenuating circumstances, and efforts to mitigate harm. The Task Force believes "that the middle culpability category – 'moderate culpability' – would account for the largest number of defendants sentenced under the guideline."  ABA Report at p. 2.  Ms. Gibson believes that, were the ABA Task Force's proposal in effect, she would fall under "low" culpability or, possibly, "moderate" culpability.

[8] "It is assumed that in most offenses involving an institutional victim, the impact is measured principally by the amount of the loss such that no additional victim impact adjustment would ordinarily be appropriate in the absence of the failure or bankruptcy of the institution."  ABA Report at p. 6.  Accordingly, Ms. Gibson believes that, were the ABA Task Force's proposal in effect, there would be no adjustment for victim impact, since there is no suggestion that her offense threatened the viability of Enterprise Bank.

[9] There are actually three offense levels (14, 15 or 16) prior to the deduction for acceptance of responsibility.  But because a defendant can obtain an extra point off for acceptance if the offense level prior to reduction is 16 or higher, then in this case the Total Offense Level is the same (13) if the level prior to the deduction is 15 or 16, since 15 minus 2 and 16 minus 3 both equal 13.

In sum, the current guideline range of 33 to 41 months is too high under the facts and circumstances of Ms. Gibson's case. This Court should not place undue weight upon the advisory guideline range.

4. **Need to avoid unwarranted sentencing disparity (18 U.S.C. § 3553(a)(6))**

Statistics compiled and published by the United States Sentencing Commission demonstrate that a below-guidelines sentence in this case would be consistent with sentencing practices in the United States, in the Eighth Circuit and in this District; accordingly, a below-guidelines sentence would promote the statutorily-imposed sentencing objective of avoiding "unwarranted sentence disparities." 18 U.S.C. §3553(a)(6).

The chart below shows the percentage of cases in which the sentencing court varied from the advisory guideline range:[10]

| FY2018 | Variances from Guidelines – All Cases | Variances from Guidelines – Fraud Cases |
|---|---|---|
| National | 24.9% | 34.8% |
| 8th Circuit | 36.4% | 40.2% |
| Eastern District of Missouri | 47.6% | 42.7% |

As the chart demonstrates, sentences below the advisory guidelines range are by no means unusual in fraud cases in the United States, in the Eighth Circuit or in the Eastern District of Missouri. Ms. Gibson respectfully believes that the Court's own knowledge and experience in adjudicating these cases, and in observing how other Judges within this District adjudicate these cases, would confirm this observation.

---

[10] United States Sentencing Commission, Statistical Information Packets, Fiscal Year 2018, Eighth Circuit and Eastern District of Missouri, Tables 8 and 10. The overwhelming majority of these cases involve downward variances. For all cases, nationally, the downward variance percentage was 22.9% (92% of the variances were downward). For all cases within the Eighth Circuit and the Eastern District of Missouri, the downward variances represented 91% and 96%, respectively, of all cases in which a variance was imposed.

Ms. Gibson also respectfully believes that a sentence along the lines of that imposed in *Eggleston* (one day time served followed by three years supervised release), if imposed herein, would also not run afoul of the goal of avoiding unwarranted sentencing disparity. Certainly the *Eggleston* case itself is remarkably similar to this case; the defendants both violated the same statute, their conduct was very similar, and the advisory guideline range for both was the same. Other Court decisions demonstrate that non-custodial or minimally-custodial sentences can be appropriate in cases even where the advisory sentencing guidelines call for imprisonment. *See*, *e.g.*, *United States v. Cole*, 765 F.3d 884 (8th Cir. 2014) (government appealed, and Court affirmed, sentence where defendant was convicted after trial of conspiracy to commit mail and wire fraud, tax evasion and conspiracy to commit tax fraud; advisory guideline range was 135 to 168 months imprisonment, but court imposed a sentence of probation).

5. **A Below-Guidelines Sentence Will Enhance Ms. Gibson's Ability to Pay Restitution (18 U.S.C. § 3553(a)(7))**

Ms. Gibson has employment and her employer has advised the Court that he would like to maintain that employment relationship. Doc. 31 at p. 18. A sentence that would allow Ms. Gibson to keep her position would enhance her ability to make payments towards her restitution obligation, one of the factors Congress has instructed sentencing courts to consider.

<u>**Conclusion**</u>

Congress has instructed sentencing courts to "impose a sentence sufficient, *but not greater than necessary*, to achieve the purposes of sentencing (punishment, deterrence, incapacitation, and rehabilitation). 18 U.S.C. § 3553(a) (emphasis added). Ms. Gibson respectfully suggests that a sentence below her advisory guideline range, including a sentence of one day time served and supervised release, would comply with this directive.

**CAPES SOKOL GOODMAN**
**& SARACHAN, P.C.**

**By: /s/ Sanford J. Boxerman**
    Sanford J. Boxerman #37436MO
    8182 Maryland Avenue, 15th Floor
    St. Louis, Missouri 63105
    (314) 721-7701 (telephone)
    (314) 721-0554 (facsimile)
    boxerman@capessokol.com

*Attorneys for Defendant Mary Ann Gibson*

<u>Certificate of Service</u>

    I hereby certify that the foregoing was filed on January 29, 2020 and served that day via the Court's electronic filing system and by email upon Senior United States Probation Officer Ryan D. Wilke (Ryan_Wilke@moep.uscourts.gov).

**/s/ Sanford J. Boxerman**

# EXHIBIT A



# A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes

*Final Draft*

*November 10, 2014*

- *The views stated in this submission are presented on behalf of the Criminal Justice Section. The report has not been approved by the House of Delegates or the Board of Governors of the American Bar Association and therefore may not be construed as representing the policy of the American Bar Association.*

**The American Bar Association Criminal Justice Section**
**1050 Connecticut Avenue, NW, Washington, DC 20036**
**202-662-1500 • crimjustice@americanbar.org**
**www.americanbar.org/crimjust**

## Economic Offenses

(a)     **Base Offense Level**:                              [6-8]

(b)     **Specific Offense Characteristics**

    (1) **Loss**.  If the loss exceeded $20,000, increase the offense level as follows:

|   |   |
|---|---|
| (A) More than $20,000 | add [4] |
| (B) More than $100,000 | add [6] |
| (C) More than $1,000,000 | add [8] |
| (D) More than $5,000,000 | add [10] |
| (E) More than $10,000,000 | add [12] |
| (F) More than $50,000,000 | add [14] |

    (2) **Culpability**

|   |   |
|---|---|
| (A) Lowest culpability | subtract [6-10] |
| (B) Low culpability | subtract [3-5] |
| (C) Moderate culpability | no change |
| (D) High culpability | add [3-5] |
| (E) Highest culpability | add [6-10] |

    (3) **Victim Impact**

|   |   |
|---|---|
| (A) Minimal or none | no increase |
| (B) Low | add [2] |
| (C) Moderate | add [4] |
| (D) High | add [6] |

(c)     **Special Offense Considerations**

For offenses of a kind specified in Section 2B1.1(b)(3) through (9), (11) through (14), or (16) through (18), the court should consider those offense characteristics to the extent they are appropriate in determining culpability or victim impact.  Where the offense presents a special concern of the kind intended to be addressed by these subsections, and where the concern has not been addressed in determining the offense level, increase by 2 offense levels. [incorporate specific Congressional directives].

(d)     **Offense level cap of 10 for non-serious offenses by first offenders**

If the defendant has zero criminal history points under Chapter 4 and the offense was not "otherwise serious" within the meaning of 28 U.S.C. § 994(j), the offense level shall be no greater than 10 and a sentence other than imprisonment is generally appropriate.

*Application Notes*:

1.    *Loss*:

      [To be incorporated from current 2B1.1 with the modification that loss means actual loss].

2.    *Culpability*:

      *Consideration of the various culpability factors*

      The guideline has 5 levels of culpability that range from lowest to highest.  The appropriate culpability level for any given case will depend on an array of factors. These include, but are not limited to: the defendant's motive (including the general nature of the offense); the correlation between the amount of loss and the amount of the defendant's gain; the degree to which the offense and the defendant's contribution to it was sophisticated or organized; the duration of the offense and the defendant's participation in it; extenuating circumstances in connection with the offense; whether the defendant initiated the offense or merely joined in criminal conduct initiated by others; and whether the defendant took steps (such as voluntary reporting or cessation, or payment of restitution) to mitigate the harm from the offense. The list is not exclusive.  Other factors may also bear on the culpability level.

      Because of the nature and number of these culpability factors, as well as the almost limitless variety of possible combinations, there is no workable formula for assigning values to each individual factor.  Rather than assign a numeric score to each individual culpability factor, the court instead arrives at one of five culpability levels after considering the combined effect of all culpability factors.  The weight that each particular culpability factor plays in a given case will vary.  In some cases, the defendant's motive will be the factor most indicative of the defendant's culpability. In other cases, extenuating circumstances will play the most prominent role.  Also, these various factors will often overlap.  A less culpable motive, or a less culpable nature of the offense, will sometimes be evident in the extenuating circumstances that prompted the defendant to commit the offense.

      The end result of the court's analysis should be a culpability level that "ranks" the defendant in the hierarchy of five levels of culpability for all defendants sentenced under this guideline. By definition, all defendants sentenced under the guideline are to some degree "culpable."  The court should not be reluctant to find a mitigating culpability value out of concern that it will signal a lack of opprobrium for the offense – the point of the analysis is to accomplish proportionality by meting out sentences that are sufficient but not greater than necessary to accomplish the purposes of sentencing in the light of each defendant's culpability when compared with all

other defendants sentenced under this guideline.

As a way of assisting the court in making the culpability assessment, it is anticipated that the middle culpability category – "moderate culpability" – would account for the largest number of defendants sentenced under the guideline. A defendant seeking an assessment of "low" or "lowest" culpability bears the burden of proof to establish this, while the government bears the burden to prove either "high" or "highest" culpability.

In assigning a culpability level, the court should be careful not to "double count" the amount of loss or the victim impact, each of which is a separate specific offense characteristic. Although in some circumstances there may be overlapping considerations bearing on each factor, loss, culpability, and victim impact are each intellectually distinct concepts warranting individualized assessment. Thus, a high loss or significant victim impact may result from conduct reflecting mitigated culpability by some or even all of the criminally responsible participants. Conversely some cases may present aggravated culpability resulting in more limited loss or victim impact.

There is also overlap between the considerations that inform the defendant's level of culpability and those that bear on the defendant's role in the offense as determined under Chapter Three. Nevertheless, as with the relationship of culpability to loss and victim impact, role in the offense is also intellectually distinct from culpability and requires separate inquiry. Where it is necessary for the court to weigh the same considerations governing role in the offense in its assessment of culpability, this may in some circumstances require a sentence outside the range resulting from a cumulative application of the culpability and role adjustments.

The court should also recognize that this guideline is intended to address *offense* characteristics. The court should continue to consider *offender* characteristics at sentencing in accordance with 18 U.S.C. § 3553(a). Although aspects of offender characteristics may overlap with culpability considerations, these are intellectually distinct concepts requiring separate consideration.

(A)    *Motive/Nature of Offense*

One factor in the culpability level is the defendant's motive or the nature of the offense. The following examples occur frequently in cases sentenced under this guideline.

> (1)    *Predatory* – These offenses are intended to inflict loss for the sole or dominant purpose of generating personal gain to the defendant or to others involved in the criminal undertaking. These offenses – accompanied by no legitimate purpose – are among the most culpable types of offenses sentenced under this guideline.

2

(2)     *Legitimate ab initio* – These offenses often arise from otherwise legitimate efforts that have crossed over into criminality as a result of unexpected difficulties.  Even though such offenses may be intended to cause loss for the purpose of generating personal gain to the defendant or to others involved in the criminal undertaking, they rank lower on the culpability scale than predatory offenses.

(3)     *Risk shifting* – These offenses are not specifically intended to cause loss.  Instead, they shift the risk of any potential loss from the defendant (or from others involved in the criminal undertaking) to a third party, such as the victim of the offense.  Examples include false statements for the purpose of obtaining a bank loan that is intended to be repaid.  Such offenses are generally less culpable than those where loss is specifically intended.

(4)     *Gatekeeping* – These offenses are not specifically intended to cause loss or even to shift the risk of loss.  Instead, they violate so-called "gatekeeping" requirements intended generally to prevent practices that create potential loss or a risk of loss.  Examples include billing Medicare for medically necessary goods and services that are actually provided without the appropriate third-party verification of medical necessity.  Such offenses are generally at the lower level of culpability under this factor.

There may be cases where the nature of the offense fits more than one of these descriptions.  And there may be cases for which none of these categories is appropriate.  Whether or not these descriptions fit a particular case, the court should take them into account when considering how the defendant's motive (including the nature of the offense) compares, for culpability purposes, to that of other defendants sentenced under this guideline whose offenses match these descriptions.

(B)     *Gain*

Another culpability factor is the gain to the defendant or to others involved in the criminal undertaking.

(1)     *Commensurate with loss* – Where the defendant and others involved in the criminal undertaking derive a gain from the offense in an amount that is roughly commensurate with the loss, this ordinarily indicates a higher degree of culpability.

3

(2)     *Less than loss* – Where the defendant and others involved in the criminal undertaking derive a gain from the offense in an amount that is less than the loss, this ordinarily indicates a lesser degree of culpability than (1).

(3)     *Minimal or Zero* – Where the defendant and others involved in the criminal undertaking derive little or no gain from the offense, this ordinarily indicates a lesser degree of culpability than (2).

The extent to which the defendant *personally* gained may also be relevant to the culpability level.  For example, an accountant convicted for participation in a securities fraud scheme would be less culpable (on the factor of gain) than an officer of the company who personally gained more than the accountant.  Also, a small amount of gain in relation to the loss may not always mean a lower level of culpability.  For example, a defendant who intentionally inflicts a large loss on others for the purpose of achieving a small gain would be more culpable with respect to the gain factor than someone who did not intend the loss.  The degree of culpability in this example varies depending on the extent to which the loss was foreseeable to the defendant.

(C)     *Degree of sophistication/organization*

Criminal undertakings involving a high degree of sophistication and/or organization generally reflect a greater threat of harm and a higher level of culpability. The reverse is also true – where the offense is executed in a simple manner without the involvement of large numbers of participants, this generally reflects a lesser threat of harm and a lower level of culpability.  The court should also consider the extent of the defendant's contribution to the offense's sophistication or organization.  A defendant with less responsibility for the offense's sophistication or organization would be less culpable, all other things being equal, than one with greater responsibility for these characteristics.

(D)     *Duration*

As with sophistication and organization, the duration of the offense and the defendant's participation in it also frequently reflects differences in culpability. Criminal undertakings that extend over several months or longer suggest a greater degree of culpability, while those that occur in a single event or over a shorter period of time in many circumstances reflect a lower level of culpability.

4

(E)    *Extenuating circumstances*

Some defendants will commit an offense in response to various circumstances, such as coercion or duress.  There are many extenuating circumstances that could contribute to the commission of an offense, and the extent of their contribution will also vary from case to case.  A defendant's culpability will be affected by the nature of these extenuating circumstances and the extent to which they played a part in the commission of the offense.

(F)    *Efforts to mitigate harm, including voluntary cessation, self-reporting, or restitution*

A defendant will sometimes take steps that help mitigate the harm or otherwise reflect a lower level of culpability.  Where the defendant voluntarily ceases the offense conduct prior to its detection, this generally indicates a decreased level of culpability.  Self-reporting of the offense is also a sign of lower culpability, as is voluntary restitution.  In considering the significance of restitution, care must be taken not to punish a defendant more severely as a result of a lack of financial resources.

The court may consider a defendant's cessation of criminal conduct even if it does not qualify as a legal defense to conviction for conduct that occurred after the defendant's involvement ceased. For example, the court may consider the fact that a defendant ceased taking part in a conspiracy even though the legal standard for withdrawing from the conspiracy was not met.

3.    <u>*Victim Impact*</u>:

The guideline has four levels of victim impact:  (1) minimal or none; (2) low; (3) moderate; and (4) high.  As with the culpability levels, there are many factors to consider in arriving at the appropriate level of victim impact.  The court should consider how the combination of these factors places the defendant's offense in comparison to victim impact in other cases under this guideline.  The court should also be cognizant that the amount of the victim(s)' loss is already accounted for and should not be counted again in the context of victim impact.  An additional score for victim impact is appropriate only where there is a harm beyond that inherent in the amount of the loss.

(A)    *Vulnerability of victims*

Where victims are identified and targeted because some particular vulnerability they suffer, this may indicate a higher degree of victim impact (and/or culpability).  The court should be careful not to "double count" the vulnerability of the victims in assessing culpability, victim impact, and the special adjustment in Chapter Three for vulnerable victims, 3A1.1(b).  Nevertheless, there may be some circumstances in

5

which the vulnerability of victims results in a peculiar degree of impact, particularly where that impact was foreseeable to the defendant, that would warrant an increase in the victim impact adjustment as well as an enhancement for vulnerable victim in Chapter Three.

(B)   *Significance of loss*

Where the victim suffers losses that threaten the victim's financial soundness, this generally indicates a higher degree of victim impact. This may be more common where the victims are individual as opposed to institutional.  It is assumed that in most offenses involving an institutional victim, the impact is measured principally by the amount of the loss such that no additional victim impact adjustment would ordinarily be appropriate in the absence of the failure or bankruptcy of the institution.

(C)   *Other non-economic harm*

Where the victim has suffered a significant non-economic harm, this may not be captured in the loss adjustment, and thus the guideline may understate the seriousness of the offense under some circumstances in the absence of an upward adjustment reflecting victim impact.

(D)   *Victim inducement of offense*

In some circumstances the victim has contributed to the offense in some manner. This  may include inducing the commission of the offense or some lesser degree of conduct.  Under such circumstances it may be appropriate to partially discount the impact on the victim as a measure of offense severity.

4.   <u>*Offense level cap for offenses that are not "otherwise serious"*</u>:

The Sentencing Reform Act provides as follows: "The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense…." 28 U.S.C. § 994(j).  Many of the offenses falling within this guideline are not "otherwise serious."

In determining whether an offense is not "otherwise serious," the court should consider (1) the offense as a whole, and (2) the defendant's individual contribution to the offense.  For example, a low level employee who is peripherally involved in what would be an "otherwise serious" offense as to other defendants may nevertheless qualify for this offense level cap.

Factors to be considered in determining whether the offense is one for which a sentence of probation is appropriate include the following: the amount of the loss; whether loss was intended at the outset of the offense conduct; whether the defendant's gain from the offense is less than the loss; whether the defendant's

6

offense conduct lacked sophistication (including whether it was committed in a routine manner or without the involvement of a large number of participants); whether the defendant acted under duress or coercion; the duration of the offense conduct and the defendant's participation in it; whether the defendant voluntarily ceased the offense conduct before it was detected; and the nature of the victim impact caused by the offense. Where the defendant has no criminal history points, and where the circumstances of the offense support a finding that the offense was not "otherwise serious," the offense level under this guideline shall be no greater than 10, and a sentence other than imprisonment is generally appropriate.

Reporter's Notes

A.     **Members of the Task Force and Principles of Consensus.**

In April 2013 the Criminal Justice Section of the American Bar Association assembled this Task Force to evaluate the reforms needed in the sentencing of federal economic crimes and to draft a proposed federal sentencing guideline to effectuate those reforms. The Task Force consists of five professors, three judges, six practitioners, two organizational representatives, and observers from the Department of Justice and the Federal Defenders:

- Stephen Saltzburg (Chair)
  Professor of Law, George Washington
  University School of Law

- James E. Felman, Esquire (Reporter)
  Kynes, Markman & Felman, P.A.

- Sara Sun Beale
  Professor of Law
  Duke University School of Law

- Barry Boss, Esquire
  Cozen O'Connor

- David Debold, Esquire
  Gibson Dunn & Crutcher

- The Honorable Nancy Gertner
  Professor of Law
  Harvard Law School

- The Honorable John Gleeson
  United States District Court
  Eastern District of New York

- A. J. Kramer (Observer)
  Federal Defender
  District of Columbia

- Gary Lincenberg, Esquire
  Bird, Marella, Boxor, Wolpert,
  Nessim, Brooks & Lincenberg

- The Honorable Gerard Lynch
  United States Court of Appeals

for the Second Circuit

- Jane Anne Murray
  Practitioner in Residence
  University of Minnesota Law School

- Kyle O'Dowd, Esquire
  Associate Executive Director for Policy
  National Association of Criminal
  Defense Lawyers

- Marjorie J. Peerce, Esquire
  Ballard, Spahr, Stillman
  & Friedman, P.C.

- Mary Price, Esquire
  Vice President and General Counsel
  Families Against Mandatory Minimums

- The Honorable Jed Rakoff
  United States District Court
  Southern District of New York

- Neal Sonnett, Esquire
  Neal R. Sonnett, P.A.

- Kate Stith
  Professor of Law
  Yale Law School

- The Honorable Jonathan Wroblewski
  (Observer)
  Director, Office of Policy and
  Legislation
  United States Department of Justice

8

After a number of meetings and telephone conferences, the group arrived at a consensus proposal subject to a number of important caveats. These caveats are an essential aspect of the proposal to avoid misunderstanding its nature and scope.

First, we feel more strongly about the structure of the proposal than we do about the specific offense levels we have assigned. We assigned offense levels in the draft because we think it is helpful in understanding the structure, but the levels have been placed in brackets to indicate their tentative nature. Indeed, in some instances we have bracketed a range of levels, although as noted below in the discussion of the "Twenty-Five Percent Rule" we recognize that a final guideline likely could not include such a range. We have performed no research and have no empirical basis for the levels we assigned in the draft.

We have applied the proposal to an array of specific case scenarios, and this exercise was very helpful to us on a number of levels. We were reassured about the structure of the proposal – we felt the proposal captured the offense characteristics most relevant to sentencing, and it placed appropriate weight on the considerations of loss, culpability, and victim impact in relation to one another. We also felt that the proposal is sufficiently clear and specific that it leads to reasonably uniform application. Although the culpability and victim impact considerations do not lend themselves to exact quantification in the same way as measuring the amount of loss, we were able to reach consensus on the application of the proposal to the scenarios without undue difficulty or disparity. Most us were comfortable with the range of outcomes that result from the levels assigned in the draft, but it should be understood that we devoted the bulk of our efforts to structural improvements and less time to issues of optimal punishment severity, in part out of a recognition that there are inherently political components to such judgments.

Second, we discussed but did not fully resolve the question of whether certain categories or types of offenses should be sentenced under a separate guideline in light of the very wide array of offenses sentenced under this guideline. We believe, in particular, that certain types of securities offenses where changes in the value of market capitalization drive the loss calculation may be especially suited for consideration under a separate guideline.

Third, the proposal is submitted as a consensus product in accordance with the following limiting principles:

1.  It is assumed that, for the foreseeable future, the current structural framework dictated by statute will remain in place, including the 25% rule (28 U.S.C. § 994(b)(2)), and that the Commission therefore will still find it necessary to assign fairly specific numeric values to sentencing considerations. The draft proposal is written to comply with that assumed structural framework, although it should be noted that the American Bar Association supports the repeal of the 25% rule. ABA Justice Kennedy Commission, Reports with Recommendations to the ABA House of Delegates (August 2004), http://www.abanet.org/crimjust/kennedy/Justice KennedyCommission ReportsFinal.pdf).

2.  This structural framework (both the 25% rule and the guidelines' overly arithmetic approach) is not ideal because it can be unduly rigid and lead to the arbitrary

9

assignment of values and the overemphasis of considerations that are more easily quantified to the detriment of equally relevant considerations that are less easily quantified.  There is also a risk under the current structural framework that a guideline will appear to carry more empirical or scientific basis than is present.

3.      A better structural framework would (a) place less emphasis on arithmetic calculations and those few sentencing considerations that lend themselves to exact quantification; and (b) allocate greater sentencing authority to the judiciary.

4.      The Task Force is not necessarily of one mind regarding the ideal allocation of sentencing authority between the Congress, the Sentencing Commission, the Judiciary, and the Executive Branch, but it was not deemed necessary to achieve consensus on this point as this proposal is premised on the assumption that the current structural framework will remain in place.

**B.      Intent of the Proposal Within the Existing Guidelines Structure**

The proposal is intended as a free-standing substitution in the Guidelines Manual for the existing Guideline Section 2B1.1.  There are two aspects of this substitution that bear particular emphasis.

First, we understand that Subsection (c) of the proposed guideline regarding Specific Offense Characteristics ("SOCs") would need to be tailored to comply with specific Congressional directives to the Sentencing Commission.  Many of these directives are open-ended, and require only that the Commission "consider" amending the guidelines as necessary in light of specific legislation.  We believe our proposal accommodates those directives by instructing  the court to apply the SOCs in the existing guideline that resulted from such directives where the offense presents a special concern of the kind intended to be addressed by these SOCs, and where that concern has not otherwise been addressed in determining the offense level under the guideline.  But we also recognize that there have been a handful of Congressional directives that required specific amendments to the guideline.  An example of such a specific directive is that contained in the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10606, 124 Stat. 119, 1006 (2010), which directed new offense level increases for higher loss frauds involving government health care programs.  Our proposal would need to be conformed to these specific directives if adopted by the Sentencing Commission.

Second, the proposal, like all provisions of Chapter Two of the Guidelines, is intended to deal solely with *offense* characteristics.  The court should continue to consider *offender* characteristics at sentencing in accordance with 18 U.S.C. § 3553(a).  Although aspects of offender characteristics may overlap with culpability considerations, these are intellectually distinct concepts requiring separate consideration.

## C.      Compliance with the "Twenty-Five Percent" Rule

Title 28 U.S.C. § 994(b)(2) provides: "If a sentence specified by the guidelines includes a term of imprisonment, the maximum of the range established for such a term shall not exceed the minimum of that range by more than the greater of 25 percent or 6 months, except that, if the minimum term of the range is 30 years or more, the maximum may be life imprisonment." Early in the life of the Sentencing Commission, it decided to construe this statutory limitation to apply not only to the final sentencing range resulting from the guidelines computation, but also to each adjustment along the route of that computation. While this construction of the statute does not appear to be compelled by its terms, our proposal is drafted on the assumption that the Commission will not revisit this question. Accordingly, we recognize that adoption of our proposal would require the Commission to select a specific numeric value for the base offense level and each of the culpability categories. As noted above, we elected to include a range of possible values in our proposal to illustrate the range of possible outcomes under it, depending on the levels ultimately selected by the Commission. We are confident, however, that if a specific value is inserted for the base offense level and each of the culpability levels, our proposal would then comply with the statute. We have heard some outside comment that because the culpability consideration groups together a wide array of factors and thus results in such a wide array of ultimate offense level outcomes, this renders the proposal violative of the statute. We do not agree with this view, and find support for our position in the observation that role in the offense also groups together a wide array of potential considerations and can result in an eight-level swing in the range resulting from those considerations. *See* U.S.S.G. §§ 3B1.1, 1.2.

## D.      Case Scenarios

These scenarios are intended to illustrate application of the proposal and the manner in which it might diverge from the current guideline. They are intended as a rough illustration of how the proposal would operate based on a very general level of detail. A much wider array of facts would frequently be relevant to a court's consideration of an appropriate sentence. Also, the scenarios do not include information regarding the history or characteristics of the offender under the assumption that these very important sentencing factors will be considered by the court in fashioning a reasonable sentence pursuant to 18 U.S.C. § 3553(a). Finally, the scoring of the scenarios continues to utilize a range of offense levels for the base and culpability factors, but we recognize that adoption of the proposal would require the selection of a specific numeric value for these factors in accordance with the "twenty-five percent" rule in 28 U.S.C. § 994(b)(2).

**Case Scenario 1**

The defendant was an organizer and leader of a fraudulent "lottery" scheme in which elderly persons were identified and contacted by telephone, advised that they had won a lottery award, and told that to obtain the award they must first pay advance fees to cover matters such as taxes, insurance, bonding, or other matters. After the victims submitted the requested fees, they were advised to expect the delivery of their winnings via armored car to their homes at specific dates and times. When the armored car did not arrive, the victims' efforts to contact those to whom they had remitted the fees were not successful. The scheme victimized 14 individuals, most of whom were 70 years old or older. For six of the victims, the losses represented their life savings. The fees paid ranged from $20,000 to $175,000, with a total loss to all victims of roughly $1.7 million. The majority of these funds were obtained by the defendant and converted to his personal use.

Score under current guideline:

| | |
|---|---|
| Base Offense level: | 7 |
| Loss: | +16 |
| more than 10 victims/mass marketing: | +2 |
| Vulnerable victim | +2 |
| Role in the offense | +4 |
| | 31 |

Score under ABA proposal:

| | |
|---|---|
| Base Offense level: | 6-8 |
| Loss: | +8 |
| Highest culpability: | +6-10 |
| High victim impact: | +6 |
| Vulnerable victim | +2 |
| Role in the offense | +4 |
| | 32-38 |

This scenario presents a predatory offense where the defendant's gain was roughly commensurate with the loss. Although the scenario does not specify the degree of sophistication or duration of the offense, some sophistication and duration is implicit in the nature and extent of the scheme. No extenuating circumstances or efforts to mitigate harm are specified. This presents a "highest culpability" offense. The victim impact is also "high" in light of the significance of the loss to six of the victims. The scheme targeted the victims based on their elderly status, and if some of them were unusually vulnerable for that reason this would be additional support for findings of high victim impact and highest culpability. It is assumed that for purposes of Chapter Three this scenario would also score adjustments for both vulnerable victim and leadership role in the offense. These adjustments are the same under both this proposal and the existing guideline as this proposal does not address Chapter Three.

**Case Scenario 2**

The defendant was the owner of a legitimate business for many years and financed the operations of the business through a line of credit secured by the inventory and accounts receivable of the business. When the business came on difficult times, the defendant caused the submission of false information to the lender regarding both inventory and accounts receivable, thus enabling the business to borrow more than it would otherwise have been permitted to borrow. The defendant also attempted to support the operations of the business by liquidating his personal assets and investing the proceeds into the business. The lender discovered the fraud and caused the termination of the business. After mitigating its losses by selling the inventory and collecting legitimate accounts receivable, the lender was left with a loss of approximately $6.9 million. A forensic accounting revealed that during the period of the fraud the defendant contributed more funds to the business than he withdrew from it in salary and other compensation.

Score under current guideline:

| | |
|---|---|
| Base Offense level: | 7 |
| Loss: | +18 |
| More than $1 Million in gross receipts: | +2 |
| Role in the offense | +4 |
| | 31 |

Score under ABA proposal:

| | |
|---|---|
| Base Offense level: | 6-8 |
| Loss: | +10 |
| Low culpability: | -3-5 |
| Low victim impact | +2 |
| Role in the offense | +4 |
| | 17-21 |

This scenario presents a mixture of legitimate ab initio and risk shifting fraud. Although the offense had some degree of sophistication, the less culpable motive, zero gain to the defendant, extenuating circumstances, and efforts to mitigate harm result in a "low culpability" score. The victim impact is also rated as "low" given that it involved a single institutional victim, but not minimal given the magnitude of the loss and the difficulty of the detection of the offense and the efforts needed to mitigate its harm. It is assumed the defendant would receive a leadership role in the offense adjustment under Chapter Three.

**Case Scenario 3**

The defendant was the owner of a durable medical equipment business that provided oxygen to Medicare patients. To qualify for reimbursement, equipment providers must ensure the oxygen is medically necessary by sending patients to an independent laboratory for testing. Instead of referring patients to independent labs for testing, the defendant caused his employees to conduct the testing themselves and then falsely represent to Medicare that the testing had been performed by an independent lab. Virtually all of the oxygen was medically necessary, although Medicare would not have paid the bills for it had the failure to qualify the patients by independent testing been disclosed. The fraud continued for more than a year, and involved in false representations regarding the testing of 159 patients. The amount billed to Medicare for their oxygen was $7.1 million. The patients were billed a small co-pay fee, and a small portion of the reimbursement for the oxygen received by these patients was also paid by 109 supplemental insurance companies.

Score under current guideline:

| | |
|---|---|
| Base Offense level: | 7 |
| Intended loss: | +20 |
| Sophisticated means: | +2 |
| Production of unauthorized access device: | +2 |
| More than 250 victims: | +6 |
| Health care fraud offense | +3 |
| Role in the offense | +4 |
| | 44 |

Score under ABA proposal:

| | |
|---|---|
| Base offense level: | 6-8 |
| Actual loss: | +10 |
| Moderate culpability: | 0 |
| Low victim impact: | +2 |
| Health care fraud offense | +3 |
| Role in the offense | +4 |
| | 25-27 |

This scenario presents a gatekeeping offense (although if the oxygen was either not provided or medically unnecessary this would be a predatory offense). Under current law in at least some circuits, the amount billed is treated as loss notwithstanding the medical necessity of the oxygen. *See, e.g., United States v. Bane*, 720 F.3d 818 (11th Cir. 2013). Notwithstanding the less culpable motive, the defendant's culpability is considered "moderate" given his personal benefit as the owner of the company, the degree of sophistication involved, the duration of the offense, and the absence of any extenuating circumstances or efforts to mitigate harm. The victim impact is considered low in light of the medical necessity of the treatments provided but not minimal in light of the sensitive nature of the government benefits program at issue. It is assumed that an additional three-level upward adjustment would be required under the Congressional directive presently located at 2B1.1(b)(7), as well as a leadership enhancement under Chapter Three.

14

**Case Scenario 4**

The defendant accepted $1,000 to act as a "straw purchaser" in a fraudulent real estate transaction that resulted in a $250,000 loss to a financial institution.

Score under current guideline:

| | |
|---|---|
| Base offense level: | 7 |
| Loss: | +12 |
| Role in the offense | <u>-2</u> |
| | 17 |

Score under ABA proposal:

| | |
|---|---|
| Base offense level: | 6-8 |
| Loss: | +6 |
| Low culpability: | -3-5 |
| Minimal victim impact: | 0 |
| Role in the offense | <u>-2</u> |
| | 5-9[1] |

This scenario presents a risk shifting offense in which the defendant's gain is minimal in relation to the loss and the offense involved limited sophistication and duration. On the other hand, the defendant knowingly played an essential role in a serious offense causing a significant risk of loss and did derive a direct personal benefit from the offense. For these reasons, the defendant's culpability would be "low" but not "lowest." The victim impact is considered minimal in that the victim is institutional, the amount of the loss did not threaten the security of the institution, and the severity of the offense conduct is adequately captured by the loss amount alone. A mitigating role in the offense adjustment under Chapter Three is assumed, but would not in all cases be applied.

---

[1]If the Base Offense Level is set at 8, Low Culpability is set at -3, and the defendant did not receive a mitigating role adjustment, this would result in an offense level 11, but in this scenario the offense level cap for non-serious offenses would cap the offense level at 10 if the defendant is a first offender.

15

# EXHIBIT B

January 30, 2020

The Honorable Henry E. Autrey
United States District Judge
Eastern District of Missouri
111 South 10th Street
St. Louis, Missouri 63102

Your Honor,

I humbly offer this personal letter to express my sincere remorse for my criminal act of bank fraud. I realize the bank is the primary victim of my deceitful actions. I am not attempting to shift blame or make excuses for my decisions. I accept sole responsibility. I made choices which I knew were morally wrong and professionally reckless. Rather than admit my own failures in managing my business, I broke the law by falsifying financial information which our bank relied upon to continue our loans. I deliberately misled the bank to avoid what I believed would be a loss of our family business. I stand ashamed to admit that I thought I was clever enough to conceal the scheme. I rationalized my actions were justified to keep the business operating long enough to sell it, paying off all the bank debt. I regret that my actions caused the government to use resources paid by hard-working taxpayers of our country.

I thank Your Honor for taking your valuable time to hear directly from me about my life, important experiences, my mistakes and personal plan to make amends.

Impact on Enterprise Bank

Banks are institutions, but from firsthand experience I learned they are run by many professionals dedicated to serving their community. My victim, Enterprise Bank, is one of the best in the country. Its mission is to provide financial services primarily to clients who are private business owners. I enjoyed long-term relationships with many of the bank's senior officers. I was proud to serve on their client advisory board for many years. I saw them socially outside of the bank. I knew their families as they mine. They were one of our most valuable business partners financing our company for over 10 years.

I am deeply sorry for their financial loss. This incident required them to commit many valuable management hours, legal support and outside expense. They also experienced unwanted publicity in the marketplace. I am not asking for their forgiveness. But I hope this letter reaches them that they may also understand the depth of my regret. I took advantage of our business relationship which was a factor leading to this loss.

## Impact on my family

My actions have caused my family emotional pain and the loss of the business has also caused them financial ruin.  Many were investors in the business and half were also production employees.  All were severely impacted by my illegal business decisions.  I had proudly served as the matriarch and second- generation leader of our family businesses.  I tried my best to set an example for the upcoming generation. I worked to teach them the importance of faith, hard work, personal integrity, and serving others.  When the pressure became too great, they witnessed my disregard for those values.  My only hope is that through my acceptance of responsibility and acknowledgement of my wrongdoings that they will learn another important lesson.

## 1980 and 1990's – My first business which funded Mozaic

My first business Designer Color Systems, Ltd. (DCS) opened with the help of my father in 1983. We served clients with marketing production services for their national advertising. Then in 1989 my father died suddenly of a brain aneurysm.  I had to immediately step into his shoes to run the family business.

DCS grew rapidly. By 1996 we had 150 employees serving major corporate clients.  I was approached by a Wall Street investor acquiring a portfolio in the graphics industry.  I took their offer and sold the business to provide stability for my employees and security for the family. I worked five more years as a member of the management team of the new buyer. In 2001 my husband and I moved to Florida and I began investing in real estate.

My former employees had meanwhile been contacting me concerned for their jobs. The parent company became overleveraged and was starting to close operations. I tried to buy the company back, but the new owners refused to sell.

## My second business: Mozaic in St. Louis d/b/a Mind's Eye in Atlanta

In February 2003, I opened Mozaic Group in St. Louis. My family and I invested a large portion of our proceeds from the 1996 sale to start up again. I was delighted that my 20-year business colleague and CPA, Ray, agreed to join me as our Chief Financial Officer.  We had a strong professional relationship and were a well-balanced business team.

One year after we opened, we took on a majority investor from our industry named SGS.  We opened the division in Atlanta named Mind's Eye.

Many of our clients were among the largest companies in the world.  After the recession in 2008 nearly all reorganized and adopted payment policies design to slow down vendor payments improving their own cash flow and profits.  This severely impacted the borrowing availability on our line of credit.

I recognize that many businesspersons live with cash flow pressure and never commit fraud.  As pressure mounted, I experienced emotional stress, but tried to do everything to overcome it.

I committed to working 100 plus hour weeks travelling to meet clients to gain new revenue. I was not sleeping due to stress and sleep apnea. I sacrificed my health for the business.  I was having chest pains and after the urging of my family, finally got tested and was diagnosed with a heart condition.  The major stress came from my primary role handling collections, where I valued the assistance of Ray, my CFO.

Unexpectedly on December 30, 2015, Ray died after spinal surgery and a pulmonary embolism. He was 52 years old.  His death brought memories of losing my father at work.  As I had learned 26 years before, I had no choice but to keep my composure for all the business stakeholders and just keep going.  I was alone with my grief trying to figure out how I and the business were both going to survive without him.

Timeline of Crimes: 2016 and 2017

Due to Ray's untimely death, I made my final decision to sell the company.  We couldn't operate within the payment terms of our clients and he was no longer there to help me fight. We could not wait to be paid for 9 months or even a year for work performed, and still make payroll every other week. Your Honor, in retrospect I should have walked away at that point and closed the business, even though that would have left an outstanding balance to the bank on the line of credit and to other creditors.  But I had a personal commitment to the bank, that was independent of my contractual personal guarantee.  I also felt personal commitments to our investors, many who were also long-time friends and business colleagues.  Since we were last in line after the bank and investors, I knew the family's stock was worthless.  My personal goal was to sell the business to maintain my commitment to others. I knew I could find another job if necessary.

I entered discussions with six interested buyers.  Three of my important salespersons showed disapproval despite my promise to protect their jobs. They were earning six figure salaries plus hefty commissions which they thought would be cut by the new buyers.  Nevertheless, we accepted an offer from SGS and went under formal letter of intent for $6.5 million and planned to close the transaction in 2017. During this same time period, cash flow was a problem throughout 2016.  The problem got worse in 2017

Most of the billing decisions were controlled by the three salespersons. In January 2017 in the midst of my efforts to sell the company, their billing dropped by 50%.  Comparing year-over-year total revenue with the same clients, same project workload, and same time period, they had billed an average of $600,000 per month; in 2017 that average dropped to $300,000 a month.  I asked them the reasons and they offered no explanation.

We could not raise any more capital due to agreements with our other investors and the bank. I had already drained my personal savings and almost all of my 401k to help the company get through the cash flow issues.

<u>The Fraudulent Invoicing</u>

During 2016 and 2017 I would add amounts to the billings as needed to make up the shortfall in the Line of Credit.  I thought it would be undetectable since I did it in a way that was consistent with past billings for the same annual promotions.  I admit I was wrong in doing whatever was necessary to keep the business open.  I knowingly began to bill invoice amounts that I knew the salespersons would not collect.  I knowingly signed fraudulent financials based on the invoice revenue that was needed for the bank line. My billing inaccurately represented our revenue and profit.  I knew it was illegal but am equally ashamed that I was violating the trust of my long-time colleagues at the bank. I pictured Ray, my deceased CFO and CPA, watching my actions from above in horror, but I still did it. Rather than close the business and accept personal responsibility for its failure as many owners are forced to do from lack of cash flow, I rationalized my illegal actions.

The SGS sale was planned for October 2017 and documentation was being prepared.  Our largest minority shareholder insisted on joining a conference call on October 13th with the SGS CFO and General Counsel.  I told him I had it covered, but he insisted. Since he was a participant in our Enterprise bank line, I could not refuse his request.  He made insulting remarks to the buyer.  The buyer's CEO called me 10 minutes later and said he refused to enter into a sale with such a volatile minority investor.  He had problems with other outside investors in the past and wasn't going introduced his company to that liability.  The deal was dead.

<u>The Bank Default</u>

Our line of credit with Enterprise was expiring on October 27, 2017, with an outstanding balance of around $2.8 million. On October 23rd, 2017, the 3 Atlanta salespersons clandestinely emailed our investors and accused me of fraudulent invoicing.  I first denied the accusation. If I admitted fraud there would be no hope to get the company sold and the bank paid.  The investors notified the bank. I informed the bank that I would write off the amounts that the salespersons accused me of inflating.  I restated the financials working with our accountants and delivered them to the bank and auditors.  The bank instructed me to get the business sold but allowed us to keep operating until I could sell.   I obtained 2 other offers which could have paid the bank off, but the salespersons didn't want to work for any of the new set of buyers I had found.  The 3 salesmen (who I had learned had formed their own company called Mind's Eye) met with Enterprise to arrange for their own financing and made a $1.5 million bid for Mozaic.  I kept negotiating for an extra earnout for the bank that could get the final price up into the range of $2 million, leaving less than a half a million of debt shortfall.

The asset purchase sale documents were approved by the bank and the deal was documented ready to close on February 9, 2018.  For my cooperation, the bank included a release from my personal guarantee for the shortfall of the bank's debt.

As the closing approached, I learned that the bank, in order to close, would require a separate agreement with the same minority investor who had disrupted the SGS sale.  On February 26, 2018 when no deal could be reached with our investor, the buyers and I were notified by the bank that the sale between us would not be permitted.  The bank foreclosed on our assets at 11:00 a.m. that day.

I still did not give up on trying to get the bank debt paid.  I had the other two buyers still warm and I notified the bank they were ready to step in with comparable offers. The bank told me there would be no formal sale of the business entity, only a public sale of assets which were scheduled later that the week. The next day the bank informed me they had already sold the same assets valued at $1.5 million in a private sale to the 3 salesmen for $60,000.  I did not understand the rationale behind their decision, but I accepted that I no longer had any control. I told them I would help in any way possible to make a smooth transition to the buyers.

<u>My efforts toward reconciliation</u>

I have and will continue to make sincere efforts to atone to those who I have harmed by my crime.

- In June 2018 I was forced to short sale my residence in Florida. I negotiated an extra $40,000 payment to Enterprise in exchange for their release of the second deed of trust.
- I used the remaining funds in my 401k to pay for reports required so that our 40 employees could transfer their savings out.
- I prepared detailed information to help Enterprise collect the remaining work in process which was worth several hundred thousand dollars.
- I attempted to help other former employees who were not invited to join the new Mind's Eye company, even though I could not find a job myself.  I helped with resumes and referrals and made phone calls on their behalf.  I did whatever I could to assist everyone who had worked for me.
- I was actively looking for employment since I had no assets. Meanwhile I was trying to help my family members who lost everything as well.  I had served on the Heat Up St. Louis board for over 10 years and actively helped raise funds for low-income users who could not pay their utilities.  I was now helping my family apply for the same type of aid, since their utilities were also threatened, but everyone were denied.
- I recognized that the failure of Mozaic had caused the financial demise of many members of my family.  I helped one file bankruptcy.  Two of them lost their homes, so I assisted with my realty background.  Most had never worked outside our business.  I helped with resumes, made what contacts that I could to help them find jobs. One of the family members wife was pregnant with their first child.  I helped them obtain health insurance since there was no Cobra available to us.
- I went to job fairs, networking meetings, and applied for hundreds of jobs online but did not received any responses. I suspected due to my age and prior job title; I was being

screened out of the online applications. My reputation had been damaged nationally in the industry, so I lost most of my professional network.

- I obtained my real estate license in Florida. I hoped that this might provide me a way to earn a living. I even hoped I could earn enough to someday pay the bank back.
- The real estate license earned me an opportunity to interview for an attorney in Florida, Louis Black. I later was hired as his executive assistant to work for the investment banking company he owned in New York.
- I continued my life-long commitment to my Catholic faith. Since we had no homes to return to, I contributed most of my personal possessions to the Vincent de Paul Society and Goodwill, as my husband and I were forced to moved out of our residences in Florida and Saint Louis.

## In Closing

Your Honor, I trust in your judgment as you consider the appropriate sentence for my illegal actions. I will be grateful for any mercy that you may grant me. The direction of my life in my senior years ahead rests with your decision. I respectfully ask that you consider the good I have done to help others throughout my life. My hope is that despite my wrongful actions, that there is some way I can continue in my administrative job so that I can make restitution. I will turn age 64 this year. While I appreciate the support of my boss, if my present job is lost, I would find it difficult to regain employment. I have virtually no assets or other ways to pay restitution to the victim unless I am working.

I plan to live the rest of my life in service to my family and community. I plan to help other business students and minority business owners. I am hoping they may learn and benefit from hearing about the consequences I have paid from my wrongful decisions so they may make better ones when they are faced with business or other life challenges. I also plan to bring awareness to executives and boards of major corporations showing the impact of their vendor payment policies on small business owners. This corporate trend impacts the lives of entrepreneurs who accept great personal risk starting businesses which create jobs for our economy.

Thank you for your consideration.

Respectfully,

*Mary Ann Gibson*

Mary Ann Gibson

# EXHIBIT C

| | Moderate Culpability | | |
|---|---|---|---|
| | (Base Offense Level could be 6, 7, or 8) | | |
| | (No change to Base Offense Level) | | |
| Base Offense Level | 6 | 7 | 8 |
| Specific Offense Characteristics: | | | |
| Loss (more than $1 million) | 8 | 8 | 8 |
| Culpability | 0 | 0 | 0 |
| Victim Impact | 0 | 0 | 0 |
| Offense Level prior to reduction for Acceptance of Responsibility | 14 | 15 | 16 |
| Acceptance of Responsibility | -2 | -2 | -3 |
| Total Offense Level | 12 | 13 | 13 |
| Guideline Range | 10 - 16 | 12 - 18 | 12 - 18 |

| | Low Culpability | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | (Base Offense Level could be 6, 7, or 8) | | | | | | | | |
| | (Deduction from Base Offense Level could be 3, 4 or 5) | | | | | | | | |
| Base Offense Level | 6 | 6 | 6 | 7 | 7 | 7 | 8 | 8 | 8 |
| Specific Offense Characteristics: | | | | | | | | | |
| Loss (more than $1 million) | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| Culpability | -3 | -4 | -5 | -3 | -4 | -5 | -3 | -4 | -5 |
| Victim Impact | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Offense Level prior to reduction for Acceptance of Responsibility | 11 | 10 | 9 | 12 | 11 | 10 | 13 | 12 | 11 |
| Acceptance of Responsibility | -2 | -2 | -2 | -2 | -2 | -2 | -2 | -2 | -2 |
| Total Offense Level | 9 | 8 | 7 | 10 | 9 | 8 | 11 | 10 | 9 |
| Guideline Range | 4 - 10 | 0 - 6 | 0 - 6 | 6 - 12 | 4 - 10 | 0 - 6 | 8 - 14 | 6 - 12 | 4 - 10 |